JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Joseph M. Rzonca

## DEFENDANTS

Borough of Parkesburg, Pennsylvania, John P. Hagan, II, Kathleen M. Rick, Melinda Keener, Wendy Keegan, John P. Coldiron, & John S. Carnes, Jr., Esquire

**(b)** County of Residence of First Listed Plaintiff    Chester
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Chester
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jeffrey P. Hoyle, Esquire
1100 North Providence Road, Suite 200
Media, PA 19063 ($84) 443-2404

Attorneys *(If Known)*
Rolf E. Kroll, Esquire
Margolis Edelstein
3510 Trindle Road, Camp Hill, PA 17011 (717) 760-7502

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*       *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | Protection Act |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 1983

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
04/16/2021

SIGNATURE OF ATTORNEY OF RECORD
*Jeffrey P. Hoyle*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

### DESIGNATION FORM

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____

Address of Defendant: _____

Place of Accident, Incident or Transaction: _____

---

*RELATED CASE, IF ANY:*

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?      Yes ☐    No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?      Yes ☐    No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?      Yes ☐    No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?      Yes ☐    No ☐

I certify that, to my knowledge, the within case ☐ **is** / ☐ **is not** related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____ *Jeffrey P. Hoyle* _____
                       *Must Sign here*
                  *Attorney-at-Law / Pro Se Plaintiff*             *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.**    *Federal Question Cases:*                  **B.**    *Diversity Jurisdiction Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts        ☐ 1. Insurance Contract and Other Contracts
☐ 2. FELA                                         ☐ 2. Airplane Personal Injury
☐ 3. Jones Act-Personal Injury                          ☐ 3. Assault, Defamation
☐ 4. Antitrust                                      ☐ 4. Marine Personal Injury
☐ 5. Patent                                        ☐ 5. Motor Vehicle Personal Injury
☐ 6. Labor-Management Relations                 ☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Civil Rights                                  ☐ 7. Products Liability
☐ 8. Habeas Corpus                              ☐ 8. Products Liability – Asbestos
☐ 9. Securities Act(s) Cases                       ☐ 9. All other Diversity Cases
☐ 10. Social Security Review Cases                          *(Please specify):* _____
☐ 11. All other Federal Question Cases
      *(Please specify):* _____

---

### ARBITRATION CERTIFICATION
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____, counsel of record *or* pro se plaintiff, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: _____ *Jeffrey P. Hoyle* _____
                       *Sign here if applicable*
                  *Attorney-at-Law / Pro Se Plaintiff*             *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOSEPH M. RZONCA | : | No.: 21-cv-1791 |
| 4117 Upper Valley Road | : | |
| Parkesburg, PA 19365 | : | |
|      Plaintiff | : | |
|     v. | : | |
| BOROUGH OF PARKESBURG, PENNSYLVANIA | : | |
| 315 West 1st Avenue, Building 1 | : | |
| Parkesburg, PA 19365 | : | |
|    and | : | |
| JOHN P. HAGAN, II, Mayor, | : | |
| Borough of Parkesburg | : | |
| 315 West 1st Avenue, Building 1 | : | |
| Parkesburg, PA 19365 | : | |
|    and | : | |
| KATHLEEN M. RICK, former Council President | : | |
| Borough of Parkesburg | : | |
| 95 Chestnut Hill Drive | : | |
| Parkesburg, PA 19365 | : | |
|    and | : | |
| MELINDA KEEN, former Council Member | : | |
| Borough of Parkesburg | : | |
| 619 West 1st Avenue | : | |
| Parkesburg, PA 19365 | : | |
|    and | : | |
| L. JAMES THOMAS, former Borough Manager | : | |
| c/o Borough of Parkesburg | : | |
| 315 West 1st Avenue, Building 1 | : | |
| Parkesburg, PA 19365 | : | |
|    and | : | |
| WENDY KEEGAN, former Borough Secretary | : | |
| Borough of Parkesburg | : | |
| 2041 Telegraph Road | : | |
| Honey Brook, PA 19344 | : | |
|    and | : | |
| JOHN P. COLDIRON, former Building Inspector | : | |
| c/o Borough of Parkesburg | : | |
| 315 West 1st Avenue | : | |
| Parkesburg, PA 19365 | : | |
|    and | : | |
| JOHN S. CARNES, JR., ESQUIRE, Borough Solicitor | : | |
| 101 West Main Street | : | |
| Parkesburg, PA 19365 | : | |
|     Defendants | : | JURY TRIAL DEMANDED |

1

## CIVIL ACTION-COMPLAINT

Plaintiff, Joseph Rzonca, by and through his counsel, The Law Offices of Jeffrey P. Hoyle, files the following Complaint in Civil Action against Defendants and alleges the following:

## JURISDICTION AND VENUE

1.      This Honorable Court has jurisdiction of this civil action pursuant to 28 U.S.C. §§ 1331 and 1343(1), (3) and (4).  The Court has supplemental jurisdiction to hear the related state causes of action.

2.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) since all of the acts described in this Complaint occurred in this District.

3.      This Court has supplemental jurisdiction over the state law claims made herein pursuant to 28 U.S.C. § 1367.

## PARTIES

4.      Plaintiff, Joseph Rzonca, is an adult individual who currently resides at the above captioned address and was previously the fee simple owner of the property identified as 8 Chestnut Street in the Borough of Parkesburg ("the Chestnut Street property" or "the subject property").

5.      Rzonca owned the Chestnut Street Property from March 16, 2006 until on or about October 6, 2014, when mortgage foreclosure proceedings were initiated by the mortgagee, Wells Fargo Bank, which ultimately resulted in a Sheriff's Sale of the property and the issuance of a Sheriff's Deed to Wells Fargo on November 14, 2016.

6.      The Borough of Parkesburg, Pennsylvania, ("Parkesburg Borough" or "the borough") is a duly incorporated municipal entity subject to the provisions of the general Borough Law under which it was incorporated and the current Borough Code of Pennsylvania, 8 P.S. §101, *et*. *seq*. formerly 53 P.S. §45101, *et*. *seq*. (repealed).

7.      John P. Hagan, II, is and was at all times relevant hereto the Mayor of the Borough, having been first elected and sworn in as Mayor in 2002.  Hagan is sued in his individual capacity for the actions in which he engaged under color of law as hereinafter described.

8.      Kathleen M. Rick was at all times relevant hereto a member of the Parkesburg Borough Council and served as President thereof.  Rick is sued in her individual capacity for the actions in which she engaged under color of law as hereinafter described.

9.      Melinda Keen was at all times relevant hereto a member of the Parkesburg Borough Council.   Rick is sued in her individual capacity for the actions in which she engaged under color of law as hereinafter described.

10.     L. James Thomas was at all relevant times hereto employed by Parkesburg Borough as its Borough Manager.  Thomas is sued in his individual capacity for the actions in which he engaged under color of law as hereinafter described.

11.     Wendy Keegan was at all relevant times hereto the Parkesburg Borough Secretary as well as serving as its Open Records Officer, records custodian, and the Assistant to the Borough Code Enforcement Officer.  Keegan is sued in her individual capacity for the actions in which she engaged under color of law as hereinafter described.

12.     John P. Coldiron was at all relevant times hereto employed by the Parkesburg Borough as its Building Inspector and allegedly for a three-month period, as its Acting Code Enforcement Officer.  Coldiron is sued in his individual capacity for the actions in which he engaged under color of law as hereinafter described.

13.     John S. Carnes, Jr., Esquire is an attorney duly licensed to practice law in the Commonwealth of Pennsylvania who at all times relevant hereto served as the Solicitor of Parkesburg Borough and in that capacity represented the borough as its attorney in the legal proceedings which are the subject of the present lawsuit.  Carnes is sued in his individual capacity

and also in his capacity as Solicitor for Parkesburg Borough during which time he was acting under color of law.

## FACTUAL BACKGROUND

14.     On or about March 16, 2006, Plaintiff, Joseph Rzonca ("Rzonca"), purchased the Chestnut Street property located within the borough and on which a single-family home had been constructed in approximately 1900.  To facilitate this purchase Rzonca executed a Note secured by a purchase money mortgage which was eventually assigned to Wells Fargo Bank, NA ("Wells Fargo") as mortgagee.

15.     In 2010, after working for other contractors in various capacities, Rzonca started his own construction contracting business doing home remodeling, decks, framing, and other general carpentry.  Because of Rzonca's experience in the construction business he was familiar with the national and building codes adopted by the various local municipalities.

16.     Following his purchase of the Chestnut Street property as his primary residence, Rzonca began making improvements to the interior of the home and in early 2012, despite the existing wood siding being in good shape and only in need of paint, Rzonca began installing new polyvinyl siding over the existing wooden siding with the goal of selling the house and purchasing another in which to live while he remodeled it for resale.  In preparing to do the residing Rzonca contacted the Borough and confirmed that installing the polyvinyl siding over the existing wooden siding would not require a permit.

17.     From the time Rzonca purchased the Chestnut Street property and moved into the borough he endeavored to become active in the community and knowledgeable about local government affairs and the business matters that effected the community and local taxes, following the published activities of Council and occasionally attending borough council meetings.

18.     Over time Rzonca became aware of certain actions by members of the borough council and the Mayor's administration that he believed represented mismanagement and waste of taxpayer dollars, including self-dealing by certain council members, use of borough vehicles for personal, non-borough related activities and outside of the borough, and unauthorized actions by the police chief and the officers of his department, and Rzonca raised these matters in public discussions and written communications with the member of borough Council and its Administration, which included all of the defendants.

19.     In 2013 Rzonca ran for Mayor as a Republican against defendant, John P. Hagan, II, the Democrat incumbent, and during that campaign Rzonca's opinions on government waste and corruption by council members and the Mayor and his administration, their misuse of taxpayer money, failure to resolve issues related to the replacement of a condemned and closed local bridge and remediation of another bridge abutment, self-dealing by one or more members of council in the resolution of the bridge projects, and misuse of borough vehicles and resources, received wider publicity as his candidacy was covered by the local newspaper and online citizen websites.

20.     Following his defeat in the November election, intending to continue in his effort to reveal to the public the abuse he believed was occurring in local government, Rzonca continued his public criticism of the administration of defendant Hagan and the actions of certain  members of borough Council, including, defendant, Melinda Keen, as well as defendant Borough Manager, Thomas, and the Chief of Police.

21.     During the years 2013 through 2015, Rzonca ramped up his criticism and inquiries into the borough council's use of tax revenue, state and federal funding for the bridge projects, and began an investigation into the ownership of certain real estate by defendant Keen who stood to personally benefit from council adopting a resolution approving a proposed bridge abutment remediation project and whose land and the business being operated thereon was receiving special

treatment and the lack of enforcement of land use and maintenance codes, and the misuse of money earmarked for completion of abridge building project for which government funds had been received and local taxes raised to pay for but which no plan had been adopted and no work completed, and the funds for which were believed to have been used for other expenses.

22.     During his investigation into these matters, Rzonca made numerous Open Records requests to defendant, Keegan, who as Borough Secretary was the custodian of the records and was the designated Open Records official with the responsibility to provide the records required to be disclosed pursuant to Pennsylvania's Right-to-Know Law, 65 P.S. §67.101 et. seq., and to provide information and explanations regarding those requests.

23.     Rzonca communicated regularly with the defendant council members, Mayor, and Borough Secretary (collectively 'the borough administration") continuing to challenge the borough administration's response to his record requests and demanding answers to questions he raised about the matters outlined in the preceding paragraphs.

24.     In the years 2013-2015, Rzonca continued to publicly discuss and regularly email the borough administration pressing for investigations into the presence on the land believed to be owned by defendant Keen ("the Keen property") of barrels of chemicals and other toxins believed to be in violation of environmental laws and regulations, the borough property maintenance code, and to be the location where an illegal business was being operated.  He also published his belief she actively concealed her ownership of the land and business by using unregistered fictitious names in the official records.

25.     Rzonca repeatedly published, discussed, and alleged in his communications with the borough administration that Keen did in fact own the Keen property but hid that fact using a non-registered or incorporated business name, "Tradewinds LLC," as the owner on the Deed, and that she had voted on a resolution which had resulted in her personal receipt of additional land and

money as part of the proceeds of the condemnation proposal she and the other council members had voted to approve.

26.     In January of 2014, following a report made by Rzonca to the Pennsylvania Department of Environmental Protection regarding the presence of toxic chemicals on defendant Keen's property, a representative of the Pa.DEP contacted the borough administration to initiate an investigation prompting borough Code Enforcement Officer, William Beers to email Rzonca and claim that his office had already been investigating Keen's property for "several zoning issues prior to [Rzonca's] initial complaint in late December 2013...[including] investigating and documenting potential violations."  Beers also confirmed that he had received a call from and had spoken with a Pa.DEP representative who he had also told that his office was already investigating several issues on the property and would be reporting to the Pa.DEP and the borough administration on the results of his investigation.

27.     In the years 2013-2015, Rzonca reported and discussed many of the foregoing issues with county and state officials and continued to regularly email the borough administration questioning these and other suspicious activities, transactions, and conduct of the borough administration, and its failure to act on public complaints and his reports concerning the alleged misconduct of members of the police department.

28.     During this time Rzonca publicly questioned why Keen had been allowed to operate illegally on the Keen property and he pressed for investigations into the ownership of the land and business as well as the property's ongoing violation of building and property codes.

29.     All communications and Open Records requests from Rzonca to the defendants went through defendant Keegan as the Borough Secretary who was responsible for the borough's compliance with the Right-to-Know Law, and Rzonca was often openly critical of her handling of his requests, her communications with the other defendants, and the paucity of documents and

information provided in response to his requests.

30.     Following his initial complaints regarding Keen's property, Rzonca received correspondence dated June 11, 2013 from Mark Harmon, the borough's Code Enforcement Officer at the time, termed a "Violation Notice" which stated that Harmon had conducted an inspection of the exterior of Rzonca's Chestnut Street property from the street abutting the property and had observed a couch, miscellaneous trash and two uninspected/unlicensed vehicles to be present on the property that he considered to be "rubbish" and "garbage", the presence of which made the property a "junkyard," a use not permitted in its zoning district.  Harmon stated that he wanted Rzonca to address these conditions so that an Enforcement Notice did not need to be issued.

31.     Although Rzonca did not agree that the items which had only been present for a day or two and were in the process of being moved warranted a citation, he promptly removed the items and Harmon noted the matter was resolved.

32.     It is believed that Harmon was directed by one or more of the borough administration defendants to find something on Rzonca's property to cite him for in retaliation for his public criticism of the borough administration and the conduct and actions that he regularly discussed and criticized.

33.     Because of Rzonca's financial difficulties stemming from a downturn in the economy and less home repair business, he no longer had the money to continue to complete the residing of his home and so at the time of Harmon's inspection of the Chestnut Street property, work on the exterior residing had been stopped, and while approximately two-thirds of one of the exterior walls had been resided, there was a small area near the top of the wall, under the eaves, where the existing wood siding had not been covered by new polyvinyl siding.

34.     At no time during his discussions with Code Enforcement officer Harmon regarding the condition of the Chestnut Street property and the partial residing that had been halted, did

Harmon state that a permit was required to install the siding, that any exposed area of the exterior wall required any work, or that there was any other "violation" of the borough's building or property maintenance code.

35.     In May of 2013, as a result of his financial difficulties, Rzonca also fell behind in his mortgage payments and received an Act 91 Notice of Intention to Foreclose from Wells Fargo.

36.     Following his loss in the 2013 Mayoral election Rzonca moved in with his girlfriend at her home at 4117 Upper Valley Road, Parkesburg, PA 19365, vacating the Chestnut Street property.

37.     Thereafter, on October 6, 2014, Wells Fargo Bank filed a Complaint in Mortgage Foreclosure against Rzonca captioned: Wells Fargo Bank, NA v. Joseph M. Rzonca, Ches.Co. CCP, No.:14-09961, which pursuant to Pennsylvania law, 41 P.S. §403 and Pa.R.C.P. Rules 3180 *et. seq.*, gave it the right to take possession of the property and seek a judgment in rem granting it ownership of the property

38.     Following its filing of the foreclosure complaint, on October 24, 2014, Wells Fargo filed all required documents and supplied all required information to borough secretary, Keegan, to comply with Borough Ordinance 505, known as the "Registration Maintenance and Security of Abandoned Real Property Ordinance" ("Vacant Property Ordinance").

39.     The Vacant Property Ordinance required mortgagees of properties for which mortgage foreclosure proceedings had been initiated and the property vacated to pay a $200.00 fee and file a registration form naming and providing contact information for the person responsible on Wells Fargo's behalf to satisfy its obligations, inter alia, to maintain the property in a secure manner, inspect the premises bi-weekly, keep its condition in compliance with the borough's Building and Property Maintenance Codes, and upon request to supply the borough's Code Enforcement Officer with copies of its inspection reports.  The Ordinance made the mortgage

company fully responsible for the condition of the property, subject to Enforcement Notices, and undertaking any repairs or maintenance required. (A true and correct copy of this Vacant Property registration form submitted by Wells Fargo is in the possession of the defendant borough and although marked as a defense exhibit during the last legal proceeding brought by the borough against Rzonca, is not in plaintiff's possession.).

40.     At the time the foreclosure proceeding was initiated, work had not been performed on the exterior of the Chestnut Street property for more than 18 months during which time the portion of the unfinished exterior wall of the house was clearly visible from the public thoroughfares to any interested observer, but based on any reasonable inspection of the wall, including the ones conducted of the entire house and exterior by Rzonca and Wells Fargo, including that portion of the exterior wall partially resided, the house remained structurally sound and weatherproof.

41.     During the course of the foreclosure proceedings after October 24, 2014, Wells Fargo inspected the premises, winterized it, and placed "No Trespassing" signs in the windows.

42.     On October 11, 2015, following an attempt to serve process at the subject property, a County Sheriff noted on a Return of Service form filed of record in the foreclosure proceedings, that the subject property was abandoned but had been winterized.

43.     Then on September 11, 2015, an Order was entered by the Chester County Court of Common Pleas granting summary judgment to Wells Fargo, ordering that the Chestnut Street property be sold at a Sheriff's Sale scheduled for February 18, 2016.

44.     Even after his move from the Chestnut Street property, Rzonca continued to demand investigations into and question the actions of the borough administration and police and he remained vocal in his claims that he believed certain actions by the public officials of the Borough that he reported were in violation of the laws applicable to their conduct. This included

police officers leaving the Borough in police vehicles and traveling to other locations, the police chief's absence from his office to take flying lessons while on duty, permitting officers from his department to allegedly joyride outside of their jurisdiction with female passengers in the front seat of their vehicles, as well as the ongoing investigations he continued to conduct into the land condemnation and bridge projects.

45.     In early December 2015, Rzonca observed defendant Thomas, the Borough Manager operating his official borough vehicle outside of the borough limits doing personal shopping, prompting Rzonca to send an email to the borough administration, including defendants Thomas and Keegan questioning why defendant Thomas was operating a Borough vehicle outside of the Borough.

46.     Sometime around December 21, 2015 Rzonca heard from several people who claimed to know and/or to have witnessed what had occurred, that defendant Thomas had been in a motor vehicle accident while operating his borough vehicle outside of the borough limits and that it was believed that he had been intoxicated.  This was an incident that many borough residents were aware of and the details discussed.

47.     It was being reported that Thomas was under the influence of alcohol at the time of the accident, that although the borough police department responded to the scene, all aspects of the incident were being concealed from the public, no police report was being prepared, and no charges were being filed against Thomas.

48.     On December 21, 2015 Rzonca sent an email to the borough administration stating, "[w]e are all wondering how Lester Thomas is doing after his accident, and if there are any details of how it happened and why he was driving a borough vehicle out of jurisdiction. Where was he going and why?"

49.     By January 11, 2016 there was growing speculation and outrage among borough residents that a cover up was occurring and that the Borough Manager was being given special treatment by police and borough council, and that the borough administration should be required to provide borough residents with complete disclosure of all of the facts and explanations of the alleged conduct, and what if any discipline would be received by defendant Thomas.

50.     On January 11, 2016 Rzonca sent an email to all the defendants, again questioning them about the lack of a police report and questioning, "Has there been an investigation on Lester James Thomas crashing the borough vehicle outside the city limits?  What are the details of the accident?"

51.     In the days that followed Rzonca continued to question the defendants about these issues and regularly send emails to the borough administration.

52.     Several days later, despite the known fact that he no longer resided at the Chestnut Street property and that the house was vacant for over two years, during which time there had been no change in the condition of the exterior of the premises and no communication from the borough's Building Inspector or Code Enforcement Official regarding the premises, and the fact that Wells Fargo had registered as the responsible party for the property, Rzonca received a Notice of Intent to File Municipal Lien dated January 11, 2016 ("Lien Notice") from Borough Solicitor Carnes.

53.     This Lien Notice was sent to the address where Rzonca was living at the time, 4117 Upper Valley Road, Parkesburg, Pa. 19365.  The Notice claimed that Rzonca owed fees for trash collection at the Chestnut Street property which together with collection fees totaled $675.00.

54.     In addition, an Enforcement Notice dated January 13, 2016 was issued by defendant Coldiron, who identified himself as the borough's Codes Enforcement Official.  The Enforcement Notice was addressed to Rzonca at the Chestnut Street property and was allegedly sent by certified

mail return receipt requested and was never delivered to him.  The undelivered letter was received back by the borough.  Rzonca later received an uncertified copy of the Notice that in all likelihood was forwarded to him by the Postmaster of the small borough.

55.     This Enforcement Notice cited two sections of the borough's International Property Maintenance Code and gave Rzonca 20 days to apply for a building permit to properly weatherproof the structure or to pay $500.00 to appeal the Notice.  True and correct copies of the Notice of Intent to File Municipal Lien dated January 11, 2016 and the Enforcement Notice date January 13, 2016 are attached hereto and made a part hereof as Exhibits "A" & "B" respectively.

56.     At the time that the Lien Notice and the Enforcement Notice were issued by defendants Carnes and Coldiron, all of the defendants had actual knowledge or were constructively aware that Rzonca had not lived at the Chestnut Street property since at least October 24, 2014 and that the mortgage secured by the property was in foreclosure.

57.     The Lien Notice and the Enforcement Notice were issued by defendants Carnes and Coldiron at the request of defendant Thomas and one or more of the other borough administration defendants after they had received Rzonca's emails questioning the details of defendant Thomas's motor vehicle accident and demanding a complete explanation of why there had been no police report, criminal charges, or discipline imposed on Thomas by the borough council defendants.

58.     The Lien Notice and the Enforcement Notice issued by defendants Carnes and Coldiron although issued in the scope and course of their employment with the borough and under state law, were not issued in the normal course of borough business or the business operations of their respective offices. The condition of the exterior of Rzonca's Chestnut Street property and Rzonca's trash collection obligation were not subjects for which either state actor would have known or taken action regarding in the ordinary course, but were issued solely at the request of Thomas and some or all of the other borough administration defendants in retaliation for Rzonca's

exercise of his first amendment right of free speech in the most recent matter involving Thomas and also the many other instances in which Rzonca expressed criticism of the defendants; including making Right-to-Know requests, seeking to have their actions investigated by outside law enforcement agencies, and other exercises of his First Amendment rights. These notices were issued in an effort to punish and deter Rzonca from exercising these rights and to continue to investigate the defendants' conduct, seek the discovery of facts and records that the defendants sought to conceal from the public, and to report his findings to the public and appropriate government officials with the ability to take action against the defendants for any misconduct related to their questioned actions, and to undermine Rzonca's credibility.

59.    There was no legitimate factual or lawful basis upon which to issue either the Lien Notice or the Enforcement Notice and these Notices were issued by defendants Carnes and Coldiron knowing that there was no lawful or legitimate basis for their issuance and proceedings thereon and all were done in bad faith knowingly and willfully and based upon false pretenses for the purpose of accomplishing the results set forth supra for which the processes were not intended nor authorized Each of the named defendants acting under color of state law participated in authorizing or ratifying the conduct of Carnes and Coldiron for the common agreed purpose of retaliating against the plaintiff and to achieve the other purposes set forth supra, all of which constituted actual malice and willful misconduct.

60.    Defendant Keegan as Borough Secretary, records custodian, and Assistant to the Building & Zoning Department had actual knowledge of the fact that Rzonca's Chestnut Street property was vacant since at least October 24, 2014, that the mortgage was in foreclosure, that no trash service had been required or provided since that time, and that any obligation related to the property was to be directed to Wells Fargo pursuant to borough Ordinance 505, and it is believed that she advised each of the other defendants of these facts either before the notices had been issued

or at some early point in the proceedings that followed.

61.    The borough administration defendants' directive that an Enforcement Notice be issued to Rzonca personally for some sham code violations was conveyed to defendant Coldiron by defendant Keegan on or about January 11, 2016 at which time he claims he went to the Chestnut street property, took two photographs with his phone from the street, only one of which purports to show the exterior of the house on the side that had been mostly resided, and then issued the sham Enforcement Notice without conducting any physical inspection of the exterior wall of the house and having no knowledge that would provide him with a good faith basis to issue the Notice.

62.    The Enforcement Notice failed to comply with the applicable mandatory requirements for such notices as provided for in Section 107.2 of borough Ordinance No. 486 by failing to state what particular condition(s) of the premises were being cited and failing to include a correction order identifying the repairs or improvements required to bring the structure into compliance.

63.    Prior to January 11, 2016, Rzonca had never been contacted by the Code Enforcement Officer or Building Inspector or any other borough official regarding any issue with the exterior of the house on the Chestnut Street property which had remained in the same condition since early in 2013.

64.    Immediately following their receipt of the January 11, 2016 email from Rzonca questioning the coverup of the facts and circumstances of Defendant Thomas' motor vehicle accident in the Borough vehicle, some or all of the defendants who received the email either directly involved themselves in the decisions to have defendant Carnes, as the borough's Solicitor, file a municipal lien against Rzonca and to notify him of that filing, and to have defendant Coldiron as the "acting Code Enforcement Officer" issue some kind of Enforcement Notice against Rzonca or each subsequently ratified that official action by Carnes and Coldiron in subsequent discussions,

decisions, actions, and proceedings of the borough council in the scope and course of their official positions and under color of state law.

65.     It is believed that both the directives to Carnes and Coldiron were conveyed to them by Keegan at the behest of Thomas and one or more of the other named defendants, and that Keegan provided both Carnes and Coldiron with the 4117 Upper Valley Road address where Rzonca had been living since December of 2013, and that although Carnes used this address to send his Lien Notice, Coldiron chose not to use Rzonca's correct address to thereby reduce or eliminate the 20 day time period within which Rzonca had to challenge the Notice.

66.     At the time of Coldiron's alleged "inspection" and observation of the Chestnut Street property, in addition to the Abandoned Property registration by Wells Fargo the property had no trespassing signs prominently displayed, official notices posted on its front door, and no signs of current occupancy on the side of the duplex that he owned, and Coldiron made no effort to observe the building exterior from the adjacent side of the duplex.

67.     Following his receipt of the Notices identified herein, Rzonca sent emails to and communicated with the defendants expressing the lack of any lawful basis for the actions being taken against him and bringing to their attention the fact that he no longer resided at the premises and that it was in foreclosure.

68.     After learning of the Enforcement Notice, plaintiff called defendant Coldiron in an effort to determine what condition of the premises Coldiron claimed was in violation of the cited code sections and advised Coldiron that he had previously confirmed with the prior Code Enforcement officer that no permit was required to install vinyl siding over existing wooden siding that remained in good condition, but at no time within the twenty days Defendant had to comply with the Enforcement Notice did Coldiron ever explain what the actual deficiency(ies) he was claiming existed or why he was requiring Rzonca to apply for a permit after the condition had

existed for over 3 years without complaint from the Borough especially since the property was the subject of foreclosure proceedings and vacant.

69.     Had the defendants actually had any good faith basis to pursue any deficiencies at the Chestnut Street property or any unpaid trash fees it could have notified Wells Fargo of the claims and Wells Fargo would have been obligated to address the citations and obligations and proceedings could have been initiated against it for its failure to do so.  A copy of Ordinance 505 is attached hereto as Exhibit "C".

70.     Despite the remedies available to the borough against Wells Fargo, defendants made no effort whatsoever to communicate with or proceed against Wells Fargo with respect to the Enforcement Notice or municipal lien; however, Wells Fargo eventually contacted defendant Carnes and satisfied the municipal lien with Carnes in October of 2016.

71.     The certified mailing of the Enforcement Notice to the Chestnut Street address came back undelivered and no actual service of the Notice was documented by the borough in any subsequent proceedings, and it asserted that Rzonca's eventual actual knowledge of the Notice was sufficient. On February 19, 2016, after the twenty-day period to remedy the deficiency or appeal the Enforcement Notice had passed, and no appeal had been filed by Rzonca, Carnes and Coldiron filed a Complaint in the District Court which was served on Rzonca at his 4117 Upper Valley Road address, and alleged that the Chestnut Street property was "not in 'good repair' with all exterior surfaces protected from the elements…in violation of the IPMC" because it was not sufficiently waterproofed and seeking a fine for this one violation in excess of One thousand dollars ($1,000.00) together with attorney's fees and costs.  A copy of the District Justice Complaint is marked Exhibit "D".

72.     At the District Court hearing Rzonca presented several defenses on his own behalf including advising the Court and defendants Carnes and Coldiron that the property was in

foreclosure, that he believed that he legally did not own the property as of the date of the Enforcement Notice, that no permit was required to do the residing work and the condition of the wall was water tight, that he was otherwise not liable to make whatever repairs the Borough required, and that the Notice he received was insufficient, all of which constituted defenses to the Enforcement Notice pursuant to §111.1 of the IPMC, which provides that "[a]n application for appeal shall be based on a claim that the true intent of this code or the rules legally adopted thereunder have been incorrectly interpreted, the provisions of this code do not fully apply, or the requirements of this code are adequately satisfied by other means; however, Carnes represented to the Court that none of those facts were true or that to the extent the property was in foreclosure Rzonca was not relieved of the obligation to comply with the Enforcement Notice, and omitted to disclose to the Court that there had been a Registration by Wells Fargo of its obligation to maintain the property pursuant to borough Ordinance 505.

73.     Following Judgment in favor of the borough based on a finding of one violation occurring on one day plus attorneys fees for a total judgment in the amount of $1,284.18, Rzonca filed a timely Notice of Appeal to the Court of Common Pleas.

74.     Thereafter, despite now indisputably having actual knowledge of the fact that the property was subject to foreclosure proceedings and that Wells Fargo was obligated to cure any deficiency in the structure and to pay any fines associated therewith, and therefore no possible good faith basis for continuing the legal proceeding against Rzonca to enforce a building code violation at the Chestnut Street premises, the defendants, acting by and through defendant Carnes as borough Solicitor, filed a Complaint in the Court of Common Pleas on April 29, 2016, now seeking a judgment based on two violations per day ($2,000.00/day) plus attorneys fees.

75.     Rzonca thereafter defended himself again pro se, filing an Answer with New Matter asserting the defenses he had previously raised.

76.     As the docket entries for the underlying state civil proceedings reflect, a considerable amount of litigation occurred between the parties prior to the arbitration, including Rzonca's efforts as a pro se litigant to file a counterclaim for wrongful use of civil proceedings and an Amended Answer, Motions by both parties thereafter related to striking one another's pleadings, briefing their respective positions, and preparing and filing Arbitration Memoranda, all of which suggests that Carnes and the other defendants were committed to punishing Rzonca well beyond any other conceivable purpose, investing considerable time and money onto obtaining a monetary judgment against Rzonca for as much money as possible regardless of the cost to the borough's taxpayers or the fact that any remediation of the condition of the property or Rzonca's ownership of it had been moot from the outset. A copy of the dockets in the matter of *Borough of Parkesburg v. Joseph M. Rzonca*, Ches. Co. CCP, Dkt. No.: 2016-03487-CV is attached hereto and made a part hereof as Exhibit "E".

77.     Prior to the scheduled arbitration of the borough's enforcement action, Wells Fargo, which had obtained a Judgment in the mortgage foreclosure proceedings on September 11, 2015 and an Order scheduling the Sheriff's sale which eventually took place on August 18, 2016, at which time Wells Fargo purchased the premises, and received a Sheriff's Deed dated November 14, 2016.

78.     Undeterred in its effort to punish the plaintiff, the borough maintained its prosecution of the enforcement action at an Arbitration held on December 16, 2016 at which time the borough, acting through Solicitor Carnes continued to assert that the borough was entitled to proceed against Rzonca despite all of the facts and circumstances related herein and which Rzonca has raised as best he could, pro se.

79.     At the arbitration Carnes refused to acknowledge the legal effect of each and every one of the defenses raised by Rzonca: that were based on the Enforcement Notice failing to comply

with the notice provisions of §107.2 of the 2009 International Property Maintenance Code, borough Ordinance 486; the fact that for quite some time before the Enforcement Notice was issued he did not reside at the property; that he was no longer and wasn't at the time of issuance the "owner" of the property; that prior to Coldiron's alleged inspection from the street, the property had been thoroughly inspected, sealed and secured by Wells Fargo and was therefore not in the condition alleged by the Code Enforcement Officer; and, that the borough was maliciously prosecuting the Enforcement action against him in retaliation for his outspoken criticism of borough officials and his investigations into council members and Borough Manager Thomas.

80.    In response to the defenses Rzonca did his best to articulate at the arbitration, Carnes represented to the panel that Rzonca had waived all of these defenses and no longer could contest his violation of the International Property Maintenance Code based upon the application of the "doctrine of administrative finality" which he represented precluded Rzonca from challenging the cited violation because he had failed to appeal the Notice and pay the $500.00 fee, and had therefore failed to preserve any challenge to the validity of the citation. As a result, the arbitrators found in the borough's favor and awarded it the sum of Twenty-two hundred and eighty-four dollars and eighteen cents. ($2,284.18), $1,000.00 of which represented violation of code provisions being violated for one day, plus attorneys fees of $1,284.18.

81.    As of the completion of the arbitration of the underlying enforcement case defendant Carnes had billed the borough for a total of 22.3 hours and for costs of $113.10.Thereafter Rzonca filed a timely appeal of the arbitration Award and once again undeterred by the fact that Rzonca no longer owned the Chestnut Street property, and that the property had in fact now been sold to new owners who had finished the house residing project, the borough maintained its prosecution of the Enforcement action, continuing to litigate Motions related to amended pleadings and preparing pre-trial motions and Memoranda.

82. On June 7, 2017 current counsel for the plaintiff entered an appearance on his behalf in advance of the trial schedule to be held before The Honorable James P. MacElree, II on July 28, 2017.

83. Thereafter, prior to the start of trial, the borough filed a Motion in Limine, asserting that because Rzonca failed to appeal the initial Enforcement Notice, he was precluded from challenging validity of the Enforcement Notice at the Trial to which counsel for Rzonca filed an Answer with a Cross Motion to Dismiss the borough's Complaint for failure to comply with the notice requirements of §107.2 of the 2009 International Property Maintenance Code ("IPMC"), borough Ordinance 486.

84. Following a discussion of the parties' respective positions in chambers prior to the start of what was scheduled to be a jury trial, the Court took the parties' pre-trial motions under advisement and ask that counsel for Rzonca confirm that his client wished to have his case heard by a jury.

85. Thereafter when the case was called to trial, counsel for Rzonca advised the Court that Rzonca had agreed to waive his right to a jury trial, following which the jury panel was excused and opening statements began, during which Rzonca's counsel again laid out the case that the borough's Enforcement Notice failed to provide the notification requirements mandated by the borough Ordinance and IPMC, including that it include a description of the specific condition(s) of the property in violation of the cited provision(s) of the IPMC and what action was required to be taken to bring the property into compliance, and instead, the borough's Enforcement Notice simply cited two sections of the IPMC without any explanation as to in what way the property was in violation of the two sections or what actions needed to be taken to cure the violations.

86. Following questioning of both counsel by the Court and the Court's review of the facts as agreed upon by the parties the Court granted Rzonca's Motion to dismiss the borough's

Complaint over the objection of defendant Carnes who maintained in a proffer to the Court that had the borough been permitted to put on its case it would have establish through the testimony of Coldiron that he and Rzonca had conversations after Rzonca received the Enforcement Notice in which he acknowledged knowing what the citation was for and that Rzonca told him that he was unwilling to put up siding, that he felt he didn't have to, and wouldn't need a permit issued to do it in any event, and that based upon the borough being able to establish that Rzonca knew what condition the citations were referring to that the deficiency of the required notice was not fatal to the borough's enforcement action.

87.     The trial court rejected this argument observing that whatever subsequent knowledge Rzonca obtained could not cure the borough's initial non-compliance with the written notice requirements of the IMPC, adding in his Opinion that the deficiency included the failure to set forth "[t]he specific violations alleged, and the specific repairs necessary" to bring the property not compliance with the Code. A copy of the Opinion of The Honorable James P. MacElree, II is attached hereto as Exhibit "F."

88.     Thereafter, the borough filed an appeal of Judge MacElree's decision to the Commonwealth Court.

89.     Following briefing and oral argument the Commonwealth Court, in an unreported panel decision that by its rules could only cited for its persuasive value, but not as binding precedent, affirmed the trial court's determination that the doctrine of administrative did not apply to the case and did not bar Rzonca from challenging the Enforcement Notice, however, the court accepted the proffer of defendant Carnes that was not of record in the case that evidence would establish that at some point Rzonca had acknowledged his understanding of the nature of the violations alleged, had not previously raised notice as a defense in prior proceedings not of record and had waited until the day of trial to do so, and had not claimed he was prejudiced by the lack

of notice. See *Borough of Parkesburg v Rzonca*, 2018 WL 6596119 (Pa. Cmwlth. 2018)(unreported panel decision).

90.     The Commonwealth Court further cited a comment by the trial court, made in response to argument being made by defendant Carnes, that was obvious obiter dictum, that the court did not doubt that during the proceedings prior to trial Rzonca knew what the violations were, as a f*inding* by the court that "Rzonca was aware of the nature of the Property Maintenance Code violations, and the record shows that he understood them" and was therefore precluded from claiming a due process violation based on improper notice.

91.     By Order and Opinion dated December 17, 2018, the Commonwealth Court vacated the Order of the Court of Common Pleas of Chester County, and remanded the case for further proceedings in which Rzonca was precluded from asserting the defense of improper notice of the Property Maintenance Code violations.

92.     Despite the increasingly obvious lack of any justifiable basis to continue to seek to enforce its property maintenance laws against Rzonca for a property he long ago had lost any ownership interest in, the borough continued to litigate the claim that the Chestnut Street property Rzonca had once owned had been in a condition that was at that time in violation of the two sections of the IMPC cited in its Enforcement Notice and that he remained liable for payment of daily fines of $1,000.00 per day per violation together with attorneys fees.

93.     On March 11, 2019 a bench trial was held before the Honorable Jeffrey R. Sommer during which the borough presented the testimony of defendant Coldiron and Joseph Rzonca, and introduced into evidence 19 trial exhibits.  None of the borough's evidence satisfied the proffers that had previously been made by Carnes to the first trial court or to the Commonwealth Court, that Rzonca had admitted in subsequent conversations with Coldiron that he was aware of the specific conditions for which he was being cited. In fact, Coldiron testified that he issued the

Enforcement Notice based only on what he believed appeared from the street to be *possible* weatherproofing issues, and that the reason the Notice stated Rzonca had to obtain a permit was so that Coldiron could actually examine the property so that he could determine what condition it was actually in.

94.     The defense cross-examined Coldiron and following the questioning of Rzonca by Carnes, asked Rzonca a few clarifying questions but otherwise merely introduced 11 exhibits into evidence at the close of the borough's case.

95.     During the borough's case the Court sought to clarify the sums that the borough was seeking from Rzonca and based upon the statutory provisions and legal interpretations represented by defendant Carnes, the Court determined that the borough was seeking a judgment against Rzonca in "the amount of $572,000.00 plus attorney's fees of $18,105.56 and court costs...for a dwelling worth only $130,000.00...[and that] the fines sought by the Borough, even if Rzonca [had been] responsible for same, would be grossly disproportionate to the gravity of the alleged violation…[which] "[c]learly, this runs afoul of the Eighth Amendment's Excessive Fines Clause."

96.     At the close of the evidence and brief summaries of their arguments and answers provided to the Court the parties submitted proposed Findings of Fact and Conclusions of Law and the Court took the case under advisement.

97.     Thereafter, on April 16, 2019 the Court rendered its Decision in favor of Rzonca and against the borough, based upon a number of findings related to the testimony and evidence presented by defendant Carnes which failed to corroborate the proffer that Carnes had represented to the first trial court and which he had repeated in his Brief to the Commonwealth Court with respect to the post-Enforcement Notice knowledge he claimed Rzonca had of the actual conditions of the Chestnut Street property upon which the Enforcement Notice was issued, finding that

Coldiron admitted that he never went onto the property to examine the structure before issuing the Enforcement Notice and that other than photographs he claimed he took on the day of the notice's issuance he had no evidence that he had ever even been to the property. A true and correct copy of the Decision of the Honorable Jeffrey R. Sommer entered on April 16, 2019 is attached hereto as Exhibit "G".

98.    The Court found that that no evidence was presented that Rzonca ever received the Enforcement Notice, that the Notice had come back to the borough as unclaimed, "that the Borough had active knowledge that Rzonca did not live at the Chestnut Street Property, that the Property was vacant, and that Rzonca [then] lived at 4117 Upper Valley…[and that] the Borough actively chose not to notify Wells Fargo, the entity which acknowledged responsibility for the Property and provided contact information expressly for this purpose, of the Enforcement Notice or Notice of Violation."

99.    The Court further found that Coldiron "never went up to or into the Property. He had no idea whether the Property was or was not "weather resistant and water tight (sic)…[that] [t]here was no testimony about whether or not the Property had exterior walls with "holes ... or rotting materials…" which were the conditions governed by the two sections of the IPMC cited in the Notice.

100.    In summarizing the basis for its decision, the Court stated, "it is clear that the Borough failed to prove a violation of the ordinance by a preponderance of the evidence. This is particularly true given the minimal effort by the Borough to assess the alleged violations and enforce the ordinance; coupled with a lack of any evidence as to the true condition of the building. judgment is hereby entered in favor of Defendant Joseph M. Rzonca and against the Borough of Parkesburg."

101.    In its Decision the court noted the intent of the drafters of the Constitution including the 8th Amendment sought to curb the government abuses that existed in England, including the government's abuse of its power to impose fines for certain conduct "to retaliate against or chill the speech of political enemies..." and that the borough's conduct in the proceedings it initiated against Rzonca was "outrageous, excessive and unconstitutional."

102.    The actions of the defendants in the issuance of borough Notice directed to Rzonca undertaken on January 11, 2016 and January 13, 2016, and that proceeded to be the subject of protracted and expensive litigation that required the authority of the Borough Council to initiate and maintain, or at a minimum be ratified on a number of occasions thereafter, represented the official policy of the Borough of Parkesburg as it was made by its lawmakers or by those whose edicts or acts may fairly be said to represent the borough's official policy.

## CAUSES OF ACTION

### COUNT I
### (Retaliation against plaintiff in violation of his rights under the First Amendment)

103.    All preceding averments of the Plaintiff's Complaint are incorporated herein and made a part hereof by this reference.

104.    At all times relevant hereto each of the defendants were duly elected, appointed, or employed by the borough of Parkesburg and with respect to all of the actions, decisions, and conduct attributed to them as alleged herein they were acting under color of state law and in the scope and course of their duties.

105.    At all times relevant hereto that it is alleged that plaintiff's public statements, correspondence and conversations with third parties, emails sent to the defendants, postings on the borough's website, and Right-to-Know requests to the borough, and his inquiry and investigation into the involvement of the Borough Manager in a motor vehicle accident while driving a borough vehicle outside of borough limits possibly under the influence for which no police investigation,

criminal charges, or discipline resulted were all constitutionally protected speech and conduct for which plaintiff's right to engage was clearly established under the First Amendment to the U.S. Constitution as well as the Pennsylvania Constitution.

106.   The actions and conduct of each of the defendants as set forth supra that were directed at or involved the plaintiff, including the issuance of the January 11, 2016 Notice of Lien for unpaid trash collection and the January 13, 2016 Enforcement Notice regarding the condition of the Chestnut Street property, and the subsequent initiation and maintenance of the civil proceedings regarding the Enforcement Notice were undertaken without any probable cause, justification, merit, reasonable basis, or support in fact or law, and were undertaken intentionally, knowingly, and maliciously, in retaliation for the plaintiff's aforesaid protected speech, for the purpose of causing the plaintiff financial harm, humiliation, emotional distress, interference with his business and personal affairs, and to punish and deter him from continuing to exercise his First Amendment right to speak out about, criticize, investigate, and report on matters of public concern regarding the conduct of the defendants.

107.   As a result of the conduct of the defendants the plaintiff's business suffered, he experienced humiliation and diminished standing in the community based upon the false claims that his person residence was not being maintained in compliance with the borough codes, he lost significant time from work and his activities of daily living because of the time it took for him to respond to the defendants' false charges and meritless litigation, interfered with his ability to save his home from mortgage foreclosure, and ultimately require that he incur the expense to hire an attorney to defend him in two trials and an appeal to the Commonwealth Court.

108.   Plaintiff is entitled to seek redress from the defendants for their aforesaid violation of his constitutional rights pursuant to 42 U.S.C. §1983.

WHEREFORE, Plaintiff respectfully request that judgment be entered against the defendants in an amount exceeding One hundred and fifty thousand dollars ($150,000.00), punitive damages, reasonable attorneys' fees and costs, injunctive relief to be fashioned by the Court to prevent such occurrences in the future, and such other legal and equitable relief as appears just and reasonable.

**COUNT II**
**(Violation of plaintiff's Fourteenth Amendment right to equal protection of the laws)**
**(Class of one)**

109.    All preceding averments of the plaintiff's Complaint are incorporated herein and made a part hereof by this reference.

110.    The Fourteenth Amendment dictates that a state may not "deny to any person within its jurisdiction the equal protection of the laws.

111.    The defendants were obligated under the 'equal protection clause of the Fourteenth Amendment to the U.S. Constitution to treat plaintiff in the same fashion and subject to the same rules and government action as every other citizen within their jurisdiction and not impose rules or take action against him that subjected him to intentional and arbitrary discrimination, whether in their interpretation of the laws applicable to him and the actions for which they were empowered to act or by their improper execution of those laws.

112.    Defendants undertook to punish and retaliate against the plaintiff for his investigation into the actions of the Borough Manager, Borough Council, and the Borough Police by intentionally disregarding the laws applicable to the inspection and citation of properties owner's whose buildings had conditions which were in violation of the borough's IPMC code, choosing not to adhere to their own laws (Ordinances), not to pursue the mortgage company that was the registered responsible party for the property, to ignore the fact that the property was in foreclosure, vacant, and sealed and winterized, to instead harass the plaintiff in the manner

described supra., and to thereafter maliciously prosecute a baseless enforcement action against him which constituted the intentional arbitrary and wholly irrational discrimination of the plaintiff as a class of one based upon his individual lawful and protected actions and not as it treated otherwise similarly situated persons because of his exercise of his protected right to free speech, all of which violated plaintiff's clearly established rights under the Fourteenth Amendment.

WHEREFORE, Plaintiff respectfully request that judgment be entered against the defendants in an amount exceeding One hundred and fifty thousand dollars ($150,000.00), punitive damages, reasonable attorneys' fees and costs, injunctive relief to be fashioned by the Court to prevent such occurrences in the future, and such other legal and equitable relief as appears just and reasonable.

## COUNT III
**(Violation of plaintiff's Fourteenth Amendment right to equal protection of the laws)**
**(Selective enforcement)**

113.   All preceding averments of the plaintiff's Complaint are incorporated herein and made a part hereof by this reference.

114.   The defendants knowingly and intentionally chose to selectively enforce the borough Code sections and enforcement laws against the plaintiff for the sole purpose of punishing and interfering with his investigation into the actions of the Borough Manager, Borough Council, and the Borough Police with respect to the motor vehicle accident in which the borough manager was involved, all of which violated plaintiff's clearly established rights under the Fourteenth Amendment.

WHEREFORE, Plaintiff respectfully request that judgment be entered against the defendants in an amount exceeding One hundred and fifty thousand dollars ($150,000.00), punitive damages, reasonable attorneys' fees and costs, injunctive relief to be fashioned by the Court to prevent such occurrences in the future, and such other legal and equitable relief as appears just and

reasonable.

## COUNT IV
### (Violation of plaintiff's right to procedural due process)
### (Property interest)

115.    All preceding averments of the plaintiff's Complaint are incorporated herein and made a part hereof by this reference.

116.    At all times relevant hereto Plaintiff had a protected property interest in both the real and personal property in which he had a recognized right to the free use and enjoyment of in the absence of any lawful obligation or recognized debt, which right was protected from interference or infringement by the state without first being afforded due process of law.

117.    The borough Ordinance adopting the IPMC and the regulations set forth therein establish the circumstances under which a real property owner could be cited for failure to maintain their real property in a condition deemed lawful under the borough's IPMC regulations, and that subject to those regulations and circumstances could be compelled to take action to comply with the law or be fined for failure to do so after being afforded the prior notice, opportunity to be heard, and to have any challenge of the borough's citation adjudicated.

118.    As set forth supra, the defendants knowingly and intentionally misused the law and failed to adhere to the provisions intended to protect Rzonca's right to due process prior to being cited for a code violation, being cited falsely and for improper purposes, not being provided with the proper and timely notice, and being prosecuted when the borough had actual knowledge that Rzonca did not reside at the property, that the mortgage was in foreclosure and a mortgage company had registered as the responsible party to respond to any borough  code issues.

119.    Based upon the actions of defendants Coldiron and Carnes process by which code enforcement regulations were intended to be enforced was undermined and misused to obtain the ability to initiate legal proceedings against Rzonca that had no basis in fact or law and which

violated his right to due process.

120.    As a result of the foregoing conduct of defendants, plaintiff was obligated to respond to the false citations issued against him and to undertake to defend himself against citations for which he had no liability.

121.    The conduct of defendants Carnes and Coldiron, as ratified and agreed upon by the other defendants, violated the clearly established rights of the plaintiff and caused the plaintiff to incur the damages previously alleged supra.

WHEREFORE, Plaintiff respectfully request that judgment be entered against the defendants in an amount exceeding One hundred and fifty thousand dollars ($150,000.00), punitive damages, reasonable attorneys' fees and costs, injunctive relief to be fashioned by the Court to prevent such occurrences in the future, and such other legal and equitable relief as appears just and reasonable.

## COUNT V
### (Violation of plaintiff's right to substantive due process)

122.    All preceding averments of the plaintiff's Complaint are incorporated herein and made a part hereof by this reference.

123.    The plaintiff has a fundamental Constitutional right to property, both real and personal, protected by the 14th amendment's concept of substantive due process which cannot be infringed by government action that is "arbitrary, irrational, or tainted by improper motive..." or by means of government conduct so egregious that its shocks the conscience.

124.    The conduct of the defendants as set forth supra was undertaken knowingly, deliberately, over a substantial period of time within which it had to reconsider the course of action that it had repeatedly chosen to initiate and maintain, clearly intended to inflict the greatest monetary damage possible on Rzonca that was from the outset and increasingly evident thereafter

unjustifiable by any legitimate government interest and as such meets ad surpasses the sort of official action that is considered to reach and exceed the required conscience-shocking level.

WHEREFORE, Plaintiff respectfully request that judgment be entered against the defendants in an amount exceeding One hundred and fifty thousand dollars ($150,000.00), punitive damages, reasonable attorneys' fees and costs, injunctive relief to be fashioned by the Court to prevent such occurrences in the future, and such other legal and equitable relief as appears just and reasonable.

**COUNT VI**
**(Violation of 8th Amendment's Excessive Fines Clause)**

125.    All preceding averments of the plaintiff's Complaint are incorporated herein and made a part hereof by this reference.

126.    Plaintiff has a right under the 8th Amendment, incorporated under the Fourteenth Amendment's Due Process Clause, to be free of government action seeking to impose a punishment or fine wholly disproportionate to the gravity of alleged offense for which it is sought.

127.    As found by the most recent trial court decision in the underlying matter, the Chestnut Street property, which Rzonca had lost in a mortgage foreclosure action several years before the borough's prosecution of him came to a final conclusion, was purchased for $130,000.00, and yet the borough "continued to pursue him for three years seeking nearly $600,000.00 in fines, attorney's fees and costs. This is outrageous, excessive and unconstitutional."

128.    The conduct of the borough in seeking to obtain a judgment against Rzonca for this outrageous sum of money was per se and indisputably a violation of his clearly established right not to be exposed to a clearly excessive fine and equally conduct for which the Constitution specifically prohibited the defendants from endeavoring to impose.

WHEREFORE, Plaintiff respectfully request that judgment be entered against the

defendants in an amount exceeding One hundred and fifty thousand dollars ($150,000.00), punitive damages, reasonable attorneys' fees and costs, injunctive relief to be fashioned by the Court to prevent such occurrences in the future, and such other legal and equitable relief as appears just and reasonable.

## COUNT VII
**(Civil conspiracy to violate plaintiff's constitutional rights and rights under state law)**

129.     All preceding averments of the plaintiff's Complaint are incorporated herein and made a part hereof by this reference.

130.     Each of the individual named defendants, and other unnamed members of Borough Council, sufficient in number to represent a majority of council, entered into agreements with one another to willfully and wantonly engage in the course of the conduct, actions, and proceedings set forth herein, that they desired and intended to accomplish the agreed upon result and purpose, and each of the defendants undertook one or more acts of clearly unreasonable character, knowing and intending the results set forth herein, consciously indifferent to the consequences to Rzonca and the citizens for whose interests they were charged to act faithfully and lawfully, and agreed and did undertake whatever action was necessary on their part to participate, authorize, or ratify the acts of any other defendant(s) necessary to accomplished the agreed upon objectives, each acting under color of state law and within the scope of their official duties, to engage in the government action intended to silence the plaintiff and prevent him from making any further credible claims against them in his speech and conduct and to discourage him from any further inquiry into their conduct, and each of them engaged in at least one act, even if simply the ratification of the acts of others, to achieve the agreed upon purpose, knowing that they were intentionally misusing their authority as state actors to deprive the plaintiff of his clearly established constitutional rights while acting under color of state law.

33

WHEREFORE, Plaintiff respectfully requests that judgment be entered against the individual named Defendants in an amount exceeding One hundred and fifty thousand dollars ($150,000.00), punitive damages, reasonable attorneys' fees and costs, injunctive relief to be fashioned by the Court to prevent such occurrences in the future, and such other legal and equitable relief as appears just and reasonable.

## COUNT VIII
### (Wrongful use of civil proceedings)

131.    All preceding averments of the plaintiff's Complaint are incorporated herein and made a part hereof by this reference.

132.    Each of the defendants acting in concert and individually as aforesaid, initiated, procured, and thereafter maintained the Enforcement proceedings and civil proceedings which followed thereafter against Rzonca as alleged supra.

133.    After considerable time, expense, emotional distress, embarrassment, loss of income, and diminished reputation was suffered by Rzonca as alleged supra., the proceedings were terminated in Rzonca's favor on April 16, 2019.

134.    In engaging in the conduct aforesaid defendants knew that the facts being alleged and upon which the proceedings were allegedly to be based were false, that there was no probable cause or reasonable basis for the belief that there was any truth or merit to the allegations being made regarding the condition of the Chestnut Street property, Rzonca's responsibility therefore, or for any of the other allegations and representations being made in the proceedings or against Rzonca, and in initiating these processes, defendants acted knowingly, intentionally, and maliciously and for purposes other than what the processes were intended to accomplish, the repair or remediation of conditions of real property to comply with the borough IPMC, and instead to retaliate against, silence, and prevent plaintiff from making any further credible claims against

34

them in his speech and conduct and to discourage him from any further inquiry into their conduct and to cause him to sustain the injuries and damages set forth supra as well as to obtain a substantial monetary judgment against him in excess of Six hundred thousand dollars ($600,000.00).

135.   The proceedings initiated against the plaintiff as aforesaid were terminated in his favor.

WHEREFORE, Plaintiff respectfully request that judgment be entered against the defendants in an amount exceeding One hundred and fifty thousand dollars ($150,000.00), punitive damages, reasonable attorneys' fees and costs, injunctive relief to be fashioned by the Court to prevent such occurrences in the future, and such other legal and equitable relief as appears just and reasonable.

## COUNT VIII
### (Abuse of process)

136.   All preceding averments of the plaintiff's Complaint are incorporated herein and made a part hereof by this reference.

137.   At all times relevant hereto, defendants initiated, maintained, and acted in concert to use the borough's code enforcement process knowingly, intentionally, and maliciously and for purposes other than what the purposes for which the enforcement process was intended, to retaliate against, silence, and prevent Rzonca from making any further credible claims against them in his speech and conduct, to discourage him from any further inquiry into their conduct, and to cause him to sustain the injuries and damages set forth supra as well as to obtain a substantial monetary judgment against him in excess of Six hundred thousand dollars ($600,000.00).

WHEREFORE, Plaintiff respectfully requests that judgment be entered against the individual named Defendants in an amount exceeding One hundred and fifty thousand dollars ($150,000.00), punitive damages, reasonable attorneys' fees and costs, injunctive relief to be

fashioned by the Court to prevent such occurrences in the future, and such other legal and equitable relief as appears just and reasonable.

## PRAYER FOR RELIEF UNDER ALL COUNTS

Plaintiffs requests a jury trial on all issues and an award of:

a.      compensatory damages

b.      punitive damages

c.      reasonable attorneys' fees and costs; and

d.      such other legal or equitable relief as appears just and reasonable.

/s/ Jeffrey P. Hoyle
JEFFREY P. HOYLE, ESQUIRE
Atty ID.: 41788
Attorney for Plaintiff
1100 North Providence Road, Suite 200
Media, PA 19063
484-443-2404

DATE: 04/16/2021